**The STATE of Ohio, Appellee,**

**v.**

**DILLARD, Appellant.**

[Cite as *State v. Dillard,* 173 Ohio App.3d 373, 2007-Ohio-5651.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21704.

Decided Oct. 19, 2007.

</div>

Carley J. Ingram, for appellee.

Daniel J. O'Brien, for appellant.

Donovan, Judge.

{¶ 1} This matter is before the court on the notice of appeal of JuWan Chino Dillard, filed July 18, 2006. On December 13, 2005, Dillard was indicted on one count of possession of heroin, in an amount exceeding 250 grams, in violation of R.C. 2925.11(A), with an attached major-drug-offender specification, pursuant to R.C. 2929.01, 2929.14(D)(3)(a), and 2941.1410. Following a jury trial, Dillard was convicted and sentenced to ten years on the possession of heroin charge and an additional eight years on the major-drug-offender specification, to be served consecutively.

{¶ 2} The events giving rise to this matter began on October 26, 2006, when officers responded to 5113 Kingsford Drive, in Trotwood, Ohio, where shots had been fired. An officer in the area heard the shots and requested that other officers respond to determine the exact location of the gunfire. Also, Renata Anderson, Dillard's girlfriend and a resident of 5113 Kingsford Drive, placed a 911 call, stating that she had heard shots near her home and that she was hiding in her closet. Responding officers found two men with gunshot wounds on the front porch of 5113 Kingsford Drive. One of them was pronounced dead at the scene and the other was transported to the hospital, where he died. There were keys hanging in the lock in the front door of the home, and as officers approached the door, Anderson opened the door and ran from the home, screaming hysterically. The officers entered the home and performed a protective sweep for other victims or suspects; no one was inside. The officers secured the scene, and a search warrant was obtained.

{¶ 3} Another officer, Roy McGill, pursued a vehicle that fled from Dillard's residence when the officers arrived. When the vehicle was stopped, McGill observed that the driver, Andre Longstreet, had been shot several times. Longstreet, who was from Chicago, initially told McGill that he had come to Dayton for a vacation, and that he did not have a gun, but in a follow-up interview at the hospital, he told the officer that he had gone to the Kingsford Drive address with a gun, with Lamont Curtis, to buy heroin from "Chino." Curtis was acquainted with Dillard, but Longstreet was not.

{¶ 4} Detective Brad Williams of the Trotwood Police Department stated the following facts in his affidavit in support of the search warrant: "That on or about October 26th, 2005, officers responded to shots fired at in [sic] the area of Kingsford Drive in the City of Trotwood. Officers attempted to stop a vehicle that fled the area and caught the subject who had been shot several times. Officers were then called to 5113 Kingsford and upon arrival found two gun shot victims on the front porch. One of the victims was pronounced dead at the scene the other was transported to the hospital."

{¶ 5} The search warrant provided that probable cause existed to find that the offenses of aggravated murder and felonious assault had occurred and that "the following items of property are connected with the commission of said offense(s): weapons, guns, bullets, bullet casings, bullet fragments, video and or surveillance tapes, any and all trace evidence related to the murder or felonious assault, to include but not limited to blood, hair, fibers. Cellular telephones, any telephone recordings, documents related to the crime and any and all illegal possessed items related to the crime of murder or felonious assault or items that may have value to motive or cause."

{¶ 6} Dillard filed a motion to suppress on April 13, 2006. At the hearing on the motion, Jon Moeggenberg, a Trotwood police officer, testified that he assisted another officer in stopping Longstreet's vehicle and then proceeded to the Kingsford Drive address. He described how he and two other officers conducted the protective sweep after Anderson fled from the home, and how they then secured the residence.

{¶ 7} Brad Williams also testified at the hearing on the motion to suppress. He stated that the gunshot victims outside the house gave us "probable cause to believe there were items related to the crime inside the house." Williams stated officers found heroin in the freezer, in a cereal box, in a canister on the kitchen counter, and in the attic of the garage. According to Williams, in his experience, a large amount of heroin may be a motive for murder. Williams stated that the cereal box, freezer, and other areas where the heroin was found were "of the size and shape that bullets, bullet fragments, evidence of a homicide would have been located in." Also seized from the residence were gel capsules in baggies, digital scales with residue, a large plastic baggie of marijuana from the kitchen cabinet, and photographs and bills linking Dillard to the address. A hydraulic industrial press with attachments was seized from the garage.

{¶ 8} Williams testified that he found Longstreet's version of events, as relayed to him by another officer who interviewed Longstreet, to be credible. Longstreet took a gun to the Kingsford Drive address because he was carrying a large sum of money and he did not want to be robbed. Williams stated, "[T]hey traveled here a couple of days prior to this incident. That they had stayed in Xenia, Ohio,

not Dayton. And that while in Xenia, Ohio, they had made contact with the defendant at his house for the purpose of heroin. The defendant had pre-arranged them to come back on this particular evening to purchase the heroin. That Longstreet knew details that they had gone to a club, they had been gone to someplace to get breakfast and had came home. When they were robbed, he (indiscernible) the situation of having a firearm and purchasing or attempting to purchase what he thought was heroin. All things, if he was going to lie about anything, he definitely wouldn't put himself in a situation where he would be implicating himself in a criminal activity.

{¶ 9} "* * *

{¶ 10} "On top of that, he was shot some five, six, seven times with through-and-through holes, didn't know if he was going to live or not live, knew the specific names, the area, how long they waited for him to come home because it was pre-arranged by the defendant for them to be there. All things he would not have known had he not been carrying on a conversation.

{¶ 11} "Again, just the fact that he's from Chicago and he knows where 5113 Kingsford is."

{¶ 12} Finally, Williams testified that, in completing the affidavit, "I wasn't going to put that there was heroin in there because I didn't know that there was heroin in there. I believed they were robbed, just like he said they were."

{¶ 13} In overruling Dillard's motion to suppress, the court determined that the motion had two components.

{¶ 14} "The first component as to the warrant was the portion of the search, a search that was conducted without a warrant. The Court finds that the totality of the circumstances including a phone call from inside the house, shooting victims on the front walk and at the time of that warrant[less] search a flight of a terrified person from the front door of the house all combined to make it appropriate for the officers to enter to search for victims, perpetrators, children and the like.

{¶ 15} "As to the search which was accomplished with the warrant, the Court finds that the evidence set forth in the affidavit was sufficient to enable both the search and the area search, which was specifically contended by the defendant and that the results of that search are admissible.

{¶ 16} "* * *

{¶ 17} "And I'll make a specific finding then that those facts set forth in that affidavit were sufficient for both the search and the area searched."

{¶ 18} At trial, the jury heard evidence from the following witnesses: Long-street testified about traveling to Dayton from Chicago with Lamont Curtis to

buy heroin from "Chino," and the events that occurred at the Kingsford address; Robert Cairo, an accident reconstructionist and evidence technician for the Trotwood Police Department, testified regarding photos he took at the Kingsford address pursuant to the search warrant; Detective Kathleen Miller of the Trotwood Police Department testified regarding the process she followed to inventory all the items seized during the execution of the search warrant; Williams testified regarding the search warrant he obtained for the 5113 Kingsford address; Kenneth Booker, a forensic chemist for the Drug Enforcement Administration, testified regarding his analysis of the drugs seized from Dillard's residence; Officer John Moeggenberg testified regarding his response to Dillard's residence; Raymond Dratt, a special agent with the Drug Enforcement Administration, testified about the common practice of pressing heroin into gel capsules for transportation and sales, as well as the similarity between the shape of the wafers of heroin found at 5113 Kingsford Drive and the press attachments found in the garage there, and he opined that the "almost sterile" press, which was free of grease, had not been used for its intended purpose, "to press such things as bearings, braces and axle seals"; Bill Toney, a detective with the city of Trotwood assigned to the Drug Enforcement Administration's task force in Dayton, testified about his role in taking custody of the items seized at the residence along with Agent Dratt; Roy McGill testified about his stop of Longstreet's vehicle, and Longstreet's initial statement that he came to Dayton for a vacation and his later remark that he came to Dayton with Lamont Curtis to buy 500 grams of heroin from "Chino"; Walter Buchanan Ivy, Dillard's first cousin, testified that numerous family members and friends of Dillard's had keys to Dillard's home and stayed there when Dillard was not present; James Faulkner, a detective with the Trotwood Police Department, testified about his interview of Longstreet at the hospital emergency room, during which Longstreet averred that he came to Dayton for a vacation; Joseph Ramey, an acquaintance of Dillard's, testified that he often stayed at Dillard's residence when Dillard was not present and that he was there on October 25, 2005, with a man named Anthony Thomas; Terry Thomas, an acquaintance of Dillard's, also testified that he often stayed at Dillard's residence when Dillard was not present; and Sergeant Joseph McCrary, of the Trotwood Police Department, testified that he was present when cars were towed from Dillard's residence pursuant to the search warrant.

{¶ 19} Dillard asserted three assignments of error in his initial brief and then, with our leave, he filed a supplemental assignment of error on August 20, 2007. On September 6, 2007, the state of Ohio filed a supplemental brief. Dillard's first assignment of error is as follows:

{¶ 20} "The trial court erred to the prejudice of the defendant, denying him his Fourth Amendment and Sec. 14, Art. 1 Constitutional rights against unreasonable search and seizure by failing to suppress evidence seized at his residence in violation of the Fourth Amendment, U.S. Constitution and Sec. 14, Art. 1, Ohio Constitution.

{¶ 21} "A. The Search Warrant is void on its face as a 'general warrant' or is overly broad and lacking particularity in authorizing search for and seizure of items 'illegally possessed' and 'items that may be of value to motive or cause.'

{¶ 22} "(1) General Principles

{¶ 23} "(2) Imprecise Description is Invalid

{¶ 24} "(3) The 'Plain View' Exception Does not Apply

{¶ 25} "(B) Standing

{¶ 26} "(C) Unconstitutionally Seized Evidence Convicted Defendant, JuWan Dillard

{¶ 27} "(D) The County Judge had no Probable Cause to Direct a Search for Drugs."

{¶ 28} First, we note, " 'Appellate courts give great deference to the factual findings of the trier of facts. At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. The trial court is in the best position to resolve questions of fact and evaluate witness credibility. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence.' " (Citations omitted.) *State v. Purser*, Greene App. No. 2006 CA 14, 2007-Ohio-190, 2007 WL 127694, ¶ 11, quoting *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990, 2006 WL 522388, ¶ 16.

{¶ 29} According to Dillard, "[T]he items seized under the search warrant as 'illegally possessed' or 'items that may have value to motive or cause,' constituted the entire evidence of heroin possession against JuWan Dillard. Without these items, there was no case; there was no other drug evidence. Without the search—a rummaging through the residence at 5113 Kingsford and the totally discretionary searching in contained cabinets, drawers, canisters, freezer and attic, there was no evidence to support the indictment of possession of heroin."

{¶ 30} In response, the state argues that the warrant was valid and the officers did not exceed its scope. The warrant authorized the officers to search the home

for weapons, bullets, trace evidence, and "items that would among other things explain the motive for the crimes," and, even if the warrant lacked probable cause, the search of the residence "would be justified based upon the good faith exception." Further, the state argues that the warrant was not overbroad or vague. "The officers were looking for guns, other weapons, bullets, and evidence related to the shooting, including evidence about the motive; they were not rummaging when they looked in small spaces and found heroin." They "were looking for bullets or guns, or other weapons, which could [be] hidden in cabinets, canisters, or boxes of cereal."

{¶ 31} The state argues that if "evidence is found that is not specifically listed in the warrant it may still be seized if 1) based upon the evidence known to the officers, the item is closely related to the crime being investigated, or 2) the officer has reasonable cause to believe the items seized were instrumentalities of the crime. * * * Furthermore, if while properly executing the search warrant officers inadvertently find an item whose incriminating character is immediately apparent, the item may be seized without further warrant."

{¶ 32} " 'In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, the task of the issuing magistrate is simply to make a practical, common sense decision whether, given all of the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates* (1983), 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527]; *State v. George* (1989), 45 Ohio St.3d 325 [544 N.E.2d 640].

{¶ 33} " 'When reviewing the sufficiency of probable cause in a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit submitted in support of the search warrant establishes probable cause. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. Great deference should be accorded to the magistrate's probable cause determination, and doubtful or marginal cases should be resolved in favor of the warrant. Id.'

{¶ 34} "* * *

{¶ 35} "Hearsay information may be relied upon by the officer providing an affidavit for a search warrant if the officer reasonably believes the information to be true. * * * The basis of knowledge and the veracity of the person supplying hearsay information are circumstances that must be considered in determining the value of the information and whether probable cause exists."

*State v. Newell*, Montgomery App. No. 21567, 2006-Ohio-5980, 2006 WL 3259296, quoting *State v. Nathan*, Montgomery App. No. 18911, 2001-Ohio-1826, 2001 WL 1468910.

██ ██ {¶ 36} "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Illinois v. Gates*, 462 U.S. at 325, 103 S.Ct. 2317, 76 L.Ed.2d 527, quoting *Spinelli v. United States* (1969), 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637. "To establish probable cause to search a home, the facts must be sufficient to justify a conclusion that the property that is the subject of the search is probably on the premises to be searched. The nexus between the items sought and the place to be searched depends upon all of the circumstances of each individual case, including the type of crime and the nature of the evidence." (Citation omitted.) *State v. Freeman*, Highland App. No. 06CA3, 2006-Ohio-5020, 2006 WL 2773451, ¶ 13.

██ {¶ 37} "The Fourth Amendment specifically commands that no warrants shall issue except those particularly describing the things to be seized. 'The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' *Marron v. United States* (1927), 275 U.S. 192, 196 [48 S.Ct. 74, 72 L.Ed. 231]. '[T]he warrant must be sufficiently definite so that the officer executing it can identify the property sought with reasonable certainty.' *State v. Muldowney* (1972), [60 N.J. 594] 292 A.2d 26, 29. '[T]he key inquiry is whether the warrants could reasonably have described the items more precisely than they did.' *State v. Benner* (1988), 40 Ohio St.3d 301, 307 [533 N.E.2d 701].

{¶ 38} "A third purpose underlying the particularity requirement is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact. The requirement of particularity is closely tied to the requirement of probable cause. It must be probable that the described items are connected with criminal activity and that they are to be found in the place to be searched. The less precise the description of the things to be seized, the more likely it will be that either or both of these probabilities has not been established.

{¶ 39} "* * *

██ {¶ 40} " '[O]bjects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.' *Harris v. United States* (1968), 390 U.S. 234, 236 [88 S.Ct. 992, 19 L.Ed.2d 1067]. The plain view doctrine comes into play when a

385

police officer discovers evidence while in the course of a search for other evidence.

 {¶ 41} "The intrusion affording the plain view must be lawful and the incriminating nature of the evidence must be immediately apparent to the seizing authority.

 {¶ 42} "The police officer need not know that the items in plain view are contraband or evidence of a crime. It is sufficient that probable cause exist to associate the property with criminal activity before evidence may be seized under the plain view doctrine." (Citations omitted.) *State v. Powell* (Dec. 15, 2000), Montgomery App. Nos. 18095, 99–CR–631, 2000 WL 1838716 (holding that search warrant at issue did not authorize the seizure of a camcorder and a videotape; the evidence contained on the tape of the crimes being investigated was not immediately apparent to the officers under the plain-view doctrine).

 {¶ 43} A catchall provision in a warrant "must be read in conjunction with the list of particularly described items which preceded it pertaining to the crimes alleged." *State v. Napier* (Apr. 16, 1999), Montgomery App. No. 17326, 1999 WL 249174. The *Napier* court determined that the following catchall provision in the warrant at issue, " 'any other contraband * * *,' standing alone, is quite broad, perhaps impermissibly so." The warrant, however, delineated several specific items, such as money, records, and receipts, including computer disks, relating to the illegal sale of alcohol, ahead of the catchall phrase, and the court determined that "the discretion of the officers executing this search warrant was reasonably guided and limited, and that the search warrant provided sufficient specificity regarding the items sought. Therefore, the catch-all phrase did not invalidate the entire warrant by authorizing a constitutionally overbroad, general exploratory search which permitted officers to rummage through any-thing and everything and seize whatever they wanted. Rather, the officers executing this warrant could identify the property being sought with reasonable certainty." Accordingly, when the officers discovered cocaine in a zippered compartment of a gym bag inside a bedroom closet, "they were searching well within the scope of the search authorized by the warrant. Under these circum-stances the officers were permitted to seize the cocaine they discovered pursuant to the plain view doctrine."

{¶ 44} The *Napier* court went on to note, "Even assuming *arguendo*, however, that the catch-all provision is impermissibly broad, that invalid portion of the warrant is clearly severable from the remaining valid portions." Id.

 {¶ 45} Further, "[i]t is well-established that the Fourth Amendment exclusionary rule will not be applied so as to bar the use of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a

detached and neutral magistrate but ultimately found to be unsupported by probable cause. *George*, 45 Ohio St.3d at 330 [544 N.E.2d 640], citing [*United States v. Leon* (1984), 468 U.S. 897, 918–923, 926, 104 S.Ct. 3430, 82 L.Ed.2d 677]. The *George* court quoted *Leon* in explaining that '[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the least negligent, conduct which has deprived the defendant of some right. Where the official action was pursued in complete good faith however, the deterrence rationale loses much of its force.' Id. at 331 [544 N.E.2d 640], quoting *Leon* at 919 [104 S.Ct. 3430, 82 L.Ed.2d 677]. In determining whether the good faith exception to the exclusionary rule applies, this court may look 'beyond the four corners of the affidavit to determine whether the officer executing the search warrant did so in good faith reliance on the magistrate's issuance of the search warrant.' [*State v. O'Connor*, Butler App. No. CA2001–08–195, 2002-Ohio-4122, 2002 WL 1832865, at ¶ 21.]" *State v. Landis*, Butler App. No. CA2005–10–428, 2006-Ohio-3538, 2006 WL 1880495, ¶ 21.

{¶ 46} In applying the totality-of-the-circumstances test to the facts before us, it is clear that the officers were looking for items inside the house connected with the commission of murder and felonious assault, specifically "weapons, guns, bullets, bullet casings, bullet fragments, video and surveillance tapes, any and all trace evidence related to the murder or felonious assault, * * * blood, hair, fibers * * * cellular telephones, * * * and any and all illegal possessed items related to the crime of murder or felonious assault or items that may have value to motive or cause." The information in the affidavit regarding multiple gunshot victims provided a substantial basis for the magistrate to conclude that probable cause existed to search the interior of the home for those items, including the areas where the heroin was found; the freezer, cereal box, and other areas searched could arguably conceal such evidence. The catchall phrase, "all illegal possessed items * * * that may have value to motive or cause," when read in conjunction with the list of particularly described items before it, did not authorize a constitutionally overbroad search. In other words, the search of those areas was not a general search but a particular one for precisely described items. As in *Napier*, even if we were to assume that the catchall provision is overbroad, that invalid portion of the warrant is severable from the rest of the warrant.

{¶ 47} Further, Williams testified at the hearing on the motion to suppress that he found Longstreet's version of events, as related to Williams by another officer, to be credible, based, among other things, on Longstreet's familiarity with the Kingsford address, that Longstreet knew details about the prearranged meeting with "Chino," and that Longstreet implicated himself in criminal activity. We cannot say, from the standpoint of the officers executing the warrant, that it was

objectively unreasonable for them to rely on the warrant based on Williams's information; there is no suggestion that Williams falsified any statements in the affidavit. Accordingly, the good-faith exception to the exclusionary rule, coupled with the attendant probable cause, would permit the trial court to deny the motion to suppress.

{¶ 48} Since the trial court did not err in overruling Dillard's motion to suppress, Dillard's first assignment of error is overruled.

{¶ 49} Dillard's second assignment of error is as follows:

{¶ 50} "The conviction must be vacated because there was insufficient evidence to support a finding of constructive possession."

{¶ 51} "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 52} The law is clear that "[n]o person shall knowingly * * * possess or use a controlled substance." R.C. 2925.11(A). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). " 'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

{¶ 53} "Possession of a drug may be either actual physical possession or constructive possession. A person has constructive possession of an item when he is conscious of the presence of the object and able to exercise dominion and control over that item, even if it is not within his immediate physical possession." (Citations omitted.) *State v. Mabry*, Montgomery App. No. 21569, 2007-Ohio-1895, 2007 WL 1174446 (finding that the totality of the facts and circumstances were sufficient to permit the reasonable inference that defendant exercised dominion and control over the mailbox just outside the front door of his apartment where crack cocaine was found, including that defendant paid rent for the apartment and lived there, that business papers addressed to the defendant were found there, and that mail addressed to defendant was found in the mailbox along with the drugs). "The State may prove dominion and control solely through circumstantial evidence." *State v. Barnett*, Montgomery App. No. 19185, 2002-Ohio-4961, 2002 WL 31105398, ¶ 11.

{¶ 54} "[O]wning or leasing a property where contraband is found is insufficient by itself to establish possession, particularly when there are other co-tenants." *State v. Weber* (Mar. 24, 2000), Montgomery App. No. 17800, 2000 WL 299564, citing *State v. Haynes* (1971), 25 Ohio St.2d 264, 270, 54 O.O.2d 379, 267 N.E.2d 787.

{¶ 55} We agree with the state that sufficient evidence was adduced to establish Dillard's constructive possession of the heroin. While witnesses for Dillard testified that multiple people often stayed at the house in Dillard's absence, it was up to the trier of fact to evaluate the credibility of all of the witnesses, and the state did not rely on the fact that Dillard owned or leased the property by itself to establish his possession of the heroin. Andre Longstreet testified that he came to Dayton, Ohio, with Lamont Curtis to meet "Chino" to buy heroin. Longstreet did not know "Chino" but was directed to his home at 5113 Kingsford Drive by Curtis. Longstreet got a good look at Dillard from a distance of arm's length, and he identified him in court as a participant in a robbery/drug deal at 5113 Kingsford Drive.

{¶ 56} Officers seized a cable bill in the name of JuWan Dillard at 5113 Kingsford Drive, as well as correspondence from Dillard's attorney addressed to him at 5113 Kingsford Drive. Verification of Dillard's social security number was found in the bedroom, as well as the title to a vehicle in Dillard's name listing the Kingsford Drive address, and other documents and personal photographs. Williams testified that the items "show the possessory resident of the house, who lives there, who stays there, who actually controls the house, people that pay for the cable, usually watch the cable."

{¶ 57} Further, the hydraulic press in the garage had attachments consistent with the size and shape of the compressed heroin found in the house, and it was free of grease, suggesting that it had not been used for its intended industrial purposes.

{¶ 58} Since the state clearly established Dillard's constructive possession of the heroin, Dillard's second assignment of error is overruled.

{¶ 59} Dillard's third assignment of error is as follows:

{¶ 60} "Alternatively, the judgment of conviction must be reversed and vacated because JuWan C. Dillard was denied his constitutional rights under the Sixth Amendment to the U.S. Constitution by the ineffective assistance of counsel and violation of the right to be confronted by the witness against him.

{¶ 61} "A. Ineffective Assistance of Counsel

{¶ 62} "(1) Andre Longstreet; Hearsay Evidence

{¶ 63} "(2) Standing Issue: Residence of JuWan Dillard

{¶ 64} "(3) Opinions Concerning the Press

{¶ 65} "B. Hearsay Evidence; Confrontation Clause."

{¶ 66} In determining whether a defendant has received the effective assistance of trial counsel, we apply the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 67} "The Ohio Supreme Court has enunciated a similar test for determining claims for ineffective assistance of counsel:

{¶ 68} " '2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.

{¶ 69} " '3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus." (Citations omitted.) *State v. Lloyd* (Mar. 31, 1999), Montgomery App. No. 15927, 1999 WL 173017.

{¶ 70} In *Strickland,* the United States Supreme Court instructed:

{¶ 71} " 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the

distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana* [ (1955), 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).

{¶ 72} "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

{¶ 73} "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 689–690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 74} According to Dillard, all of Longstreet's "knowledge about JuWan Dillard, other than seeing his face, was from an out-of-court declarant, never under oath and never subject to cross examination, Lamont Curtis." Dillard argues that his counsel should have requested a preliminary examination or "voir dire" of Longstreet, pursuant to Evid.R. 104(A), prior to his direct testimony, to

establish that "all of Longstreet's knowledge concerning JuWan Dillard was inadmissible hearsay from Lamont Curtis" and not based on Longstreet's personal knowledge. Further, Dillard argues that his counsel should have objected that Longstreet's testimony "was not competent and was irrelevant."

{¶ 75} Evid.R. 104(A) provides that "[p]reliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court." Longstreet, from an arm's-length distance, observed Dillard at the 5113 Kingsford Drive address, Dillard's home, where Longstreet testified that he had gone to complete a drug deal, and he identified Dillard in court based on his observation. That Longstreet was not acquainted with Dillard and did not know his name does not render his identification of him incompetent. We cannot say that defense counsel's failure to request voir dire of Longstreet, or object to his identification of Dillard, fell below an objective standard of reasonable representation such that, were it not for counsel's failure, the trial would not have resulted in Dillard's conviction. In all likelihood, such a requested voir dire would have been appropriately denied.

{¶ 76} According to Dillard, if we determine that he "failed to prove standing, it is clear from the record that such a failure is the result of ineffective assistance of counsel."

{¶ 77} "Standing to invoke the protection of the Fourth Amendment depends on whether the person who claims it has a legitimate expectation of privacy in the place invaded by a police search and seizure." *State v. Peterson,* 166 Ohio App.3d 112, 2006-Ohio-1857, 849 N.E.2d 104, ¶ 9.

{¶ 78} The following exchange occurred at the hearing on the motion to suppress:

{¶ 79} By counsel for Dillard:

{¶ 80} "Q. Other than what you said that Kathy Miller–Kinsey told you about weapons in the house and that sort of thing may be in there, did you have any other reason to get a search warrant to search the house?"

{¶ 81} By Brad Williams:

{¶ 82} "A. The two people that were later dead on the outside and the third that was shot, with the resident of the house being the only one not on the scene but was seen at the scene, yes.

{¶ 83} "Q. But you saying the residents of the house. In your investigation before the search warrant or even at the time, you learned that Mr. Dillard did not own the house, didn't you?

{¶ 84} "A. Afterwards, yes.

{¶ 85} "Q. You learned that there was a resident of the house. In fact, you heard the testimony, ran out of the house."

{¶ 86} By the state:

{¶ 87} "Objection your Honor. If the Defense is going down this line, then there's no standing for Dillard to even be having the Motion to Suppress. As such, this would all be irrelevant."

{¶ 88} The court overruled the state's objection. While the state argued in its opposition to Dillard's motion to suppress that Dillard failed to show "any expectation of privacy in the area searched," the trial court did not address the issue, and the state concedes that the "question of standing is a non-issue." We agree. Having ruled on the merits, clearly the court deemed Dillard to have standing to challenge the search.

{¶ 89} Dillard next argues that his counsel was ineffective for failing to object to the testimony of Agent Dratt, whose opinions regarding the hydraulic press were "not based on facts in the record or facts perceived by Agent Dratt * * * if he had qualified as an expert." According to Dillard, his counsel failed to "seek to voir dire Agent Dratt outside the presence of the jury where he could have shown the lack of factual basis and potentially had the opinions excluded in advance."

{¶ 90} Evid.R. 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." Agent Dratt did not offer expert opinions about the press found in the garage, and Evid.R. 703 does not apply.

{¶ 91} "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Evid.R. 701. Dratt testified, "[T]ypically when we see heroin and it's in a compressed form, it's what's called a finger. A finger is a compressed tube of heroin that looks like your finger and then they put it in a rubber or latex glove, stretch the glove, tie the finger off and cut it off that's what is called a finger." Dratt was asked if the shape of the heroin found at Dillard's residence had "any significance with anything else that was found at the scene of 5113 Kingsford" He responded, "the cylindrical wafer, if you will, appears to be the same diameter, shape and size as a—the press attachment that we found at the location." Dratt noted that the press was free of grease, and stated, "[T]ypically, when you use them for what they're designed to be used for, there is grease, and all kinds of, you know, dirty things around it as grease is typically—axle grease is very dirty and smelly. This particular press is clean, it has been used obviously but not for its designed

purpose to the best of my knowledge." Dratt went on to state, "Now, the other thing that through my training and experience I would like to mention is the fact that when you see a press, typically there is things that go along with the press like tools.

{¶ 92} "Somebody who has a press in their home for legitimate use is obviously going to be handy and have the ability to use tools, this particular press was a stand-alone press. I saw no toolbox or anything of that nature to indicate that the press was being used for its intended purpose, which is, you know, in the mechanical field."

{¶ 93} Dratt's testimony falls clearly within the purview of Evid.R. 701; he testified as a layperson about his opinions, which were based on his own perceptions and which were helpful to the factfinder. Dillard's counsel was not ineffective for failing to seek to have Dratt's opinions stricken, as Dillard alleges. In other words, counsel's failure to object did not fall below an objective standard of reasonableness, and, had counsel objected, the outcome of the trial would not have been different.

{¶ 94} Finally, Dillard argues that "it was a denial of JuWan Dillard's rights to admit the hearsay evidence from Lamont Curtis through Andre Longstreet, that was necessary to convict JuWan Dillard of possession of the controlled substance. Since this was the only testimony identifying JuWan Dillard as being at the scene and being the person from whom the controlled substance was to be purchased, this admission cannot be classified as harmless. Its admission was 'plain error' that the Court should consider even without objection under Crim.R. 52(B)."

{¶ 95} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

{¶ 96} As discussed above, Longstreet clearly observed Dillard from an arm's-length distance at Dillard's residence and identified him in court as the person from whom he sought to purchase heroin. In other words, Longstreet's testimony about Curtis was not "the only testimony identifying JuWan Dillard as being at the scene and being the only person from whom the controlled substance was to be purchased." Had counsel for Dillard objected to Longstreet's testimony about Curtis, the outcome of the trial would not have been different, and there is no plain error as Dillard argues. Dillard's third assignment of error is overruled.

{¶ 97} Dillard's supplemental assignment of error is as follows:

{¶ 98} "The trial court violated defendant-appellant's right to a trial by jury and right to have each element of the offense against him proved beyond a reasonable doubt as guaranteed by the Sixth Amendment and Fourteenth Amendment to the United States Constitution by finding the facts to support a prison sentence of ten (10) years for possession and an enhancement of his

sentence for an additional consecutive eight (8) year term contrary to the guarantees of the Constitution, and based on a statute declared unconstitutional."

{¶ 99} The Ohio Supreme Court declared R.C. 2929.14(D)(3)(b), pursuant to which Dillard received an additional eight-year term as a major drug offender, unconstitutional, and the court severed the statutory subsection from Ohio's felony-sentencing scheme in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. R.C. 2929.14(D)(3)(b) provided, "The court imposing a prison term on an offender under division (D)(3)(a) of this section may impose an additional prison term of one, two, * * * or ten years" under certain conditions. In other words, due to Dillard's status as a major drug offender, the excised statutory subsection would have permitted the trial court to make findings and impose an "add-on" term of one to ten years to Dillard's sentence.

{¶ 100} In *State v. Adams*, Lake App. No.2006–L–114, 2007-Ohio-2434, 2007 WL 1461763, ¶ 27, the court determined that "only the requirement to make factual findings before imposing 'the add-on' has been severed" from Ohio's sentencing guidelines, and the sentencing court retains full discretion to impose an enhanced penalty in the absence of judicial fact finding. The dissent in *Adams*, however, concluded, "Trial courts are not permitted to 'add on' to maximum sentences by making judicial findings. Such a practice clearly emaciates the term 'maximum' and inherently adds to the confusion currently surrounding sentencing in Ohio." Id. at ¶ 35. Although we agree with the *Adams* dissent's conclusion that the add-on term is improper, we reach this conclusion because an add-on sentence cannot be predicated upon R.C. 2929.14(D)(3)(b). R.C. 2929.14(D)(3)(b), which provided the only statutory language permitting an enhancement to the underlying ten-year term, has been excised from the statutory scheme. Thus, while Dillard's ten-year sentence for possession of heroin is a lawful mandatory sentence which still is proper under R.C. 2929.14(D)(3)(a), the add-on eight-year sentence Dillard received is based upon R.C. 2929.14(D)(3)(b), which the Ohio Supreme Court deemed unconstitutional and has been excised. Accordingly, we sustain Dillard's supplemental assignment of error, vacate the add-on eight-year sentence, and remand the matter for resentencing consistent with this opinion.

Sentence vacated
and cause remanded.

FAIN, J., concurs.

GRADY, J., dissents.

GRADY, Judge, dissenting.

{¶ 101} Ironically, officers had sufficient probable cause to obtain a warrant to search defendant's residence for drugs, based on what the seriously injured Longstreet had told them about the drug deal that went bad and the two shooting deaths that occurred outside the house. Instead, officers sought and procured a warrant to search inside the house for evidence related to the homicide and assault offenses the shootings involved. Then, acting on the authority of the overly broad concluding clause of the warrant ("and any and all illegal [sic] possessed items related to the crime of murder or felonious assault on items that may have value to motive or cause"), officers conducted a pretextual search for illegal drugs and articles related to drug trafficking, and they seized that evidence when they found it.

{¶ 102} In my view, there is simply no way to reconcile the loose and general concluding language of the warrant with the express particularity requirement of the Fourth Amendment. It simply will not do to allow officers to decide for themselves whether evidence may be seized because, in their judgment, it may be probative of a motive for a crime they are investigating. Also, though officers may always seize other evidence which they know to be illegal when it is in plain view, the fact that "illegal" evidence may be present cannot authorize a warrant to go in and find it in plain view. There must be probable cause to believe it is there and a warrant particularly describing it. Otherwise, the judicial authority is transferred to and exercised by officers who perform a search on a pretext the warrant sets up.

{¶ 103} *State v. Napier* (Apr. 16, 1999), Montgomery App. No. 17326, 1999 WL 249174, involved a warrant containing similarly broad language. However, in *Napier,* the officers performing the search discovered cocaine inside a gym bag where other articles specifically described in the warrant reasonably might be found. In the present case, officers searched inside a cereal box, a freezer, and other locations, purportedly to find weapons, bullets, etc., as well as "blood, hair, and fibers." The connection between such articles and the locations that were searched is simply too attenuated to support the search that was performed. After all, the shootings took place outside the house, not in or around those places.

{¶ 104} On this record, I would reverse the trial court's order denying defendant's motion to suppress evidence and remand the case for a good-faith inquiry pursuant to the rule of *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677. Even though the officers clearly knew that the object of their search was drugs, if they reasonably believed that the concluding clause of the warrant authorized their search for drugs, the court may yet deny the motion to suppress evidence. That is an issue for the trial court to resolve.